IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

TERESA GAIL PERRY,

      Plaintiff,                                 No. 2:11-cv-3121-KJN

     v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.                             <u>ORDER</u>

_____/

        Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying plaintiff's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI, respectively, of the Social Security Act ("Act").[1]  In her motion for summary judgment, plaintiff principally contends that the Commissioner erred by finding that plaintiff was not disabled from August 27, 2008, through the date of the final administrative decision. (Dkt. No. 18.)  The Commissioner filed an opposition to plaintiff's motion and a cross-motion for summary judgment. (Dkt. No. 20.)  For the reasons that follow, the court grants plaintiff's motion for summary judgment in part, denies

---

[1] This case was referred to the undersigned pursuant to E.D. Cal. L.R. 302(c)(15) and 28 U.S.C. § 636(c), and both parties voluntarily consented to proceed before a United States Magistrate Judge. (Dkt. Nos. 9, 11.)

1

the Commissioner's cross-motion for summary judgment, and remands the case for further proceedings under sentence four of 42 U.S.C. § 405(g).

I.  BACKGROUND

Plaintiff was born on June 29, 1958, has at least a high school education, and previously worked as a fast food worker, cake decorator, census taker, mail handler, agricultural sorter, and in-home care provider.[2]  (Administrative Transcript ("AT") 38-41, 132, 136.)  On April 30, 2009, plaintiff applied for DIB and SSI, alleging that she was unable to work as of August 27, 2008, primarily due to bulging discs in her back, chronic obstructive pulmonary disease ("COPD"), and memory loss.  (AT 11, 80-81, 132, 136, 153.)  On September 1, 2009, the Commissioner determined that plaintiff was not disabled.  (AT 80-81.)  Upon plaintiff's request for reconsideration, the determination was affirmed on March 1, 2010.  (AT 85-86.)  Thereafter, plaintiff requested a hearing before an administrative law judge ("ALJ"), which took place on December 1, 2010.  (AT 11, 34.)

In a decision dated December 22, 2010, the ALJ determined that plaintiff had not been under a disability, as defined in the Act, from August 27, 2008, through the date of that decision.  (AT 11-21.)  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on September 23, 2011.  (AT 1-6.)  Thereafter, plaintiff filed this action in federal district court on November 22, 2011, to obtain judicial review of the Commissioner's final decision.  (Dkt. No. 1.)

II.  ISSUES PRESENTED

Plaintiff has raised the following issues: (1) whether the ALJ improperly rejected the opinion of plaintiff's treating physician regarding plaintiff's mental and physical impairments; and (2) whether the ALJ failed to properly credit the testimony of plaintiff and third

---

[2]  Because the parties are familiar with the factual background of this case, including plaintiff's medical history, the court does not exhaustively relate those facts in this order.  The facts related to plaintiff's impairments and medical history will be addressed insofar as they are relevant to the issues presented by the parties' respective motions.

parties as to the nature and extent of plaintiff's functional limitations.

III.     LEGAL STANDARD

The court reviews the Commissioner's decision to determine whether (1) it is based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in the record as a whole supports it.  Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999). Substantial evidence is more than a mere scintilla, but less than a preponderance.  Connett v. Barnhart, 340 F.3d 871, 873 (9th Cir. 2003) (citation omitted).  It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007), quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).  "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities."  Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citation omitted).  "The court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation."  Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).

IV.     DISCUSSION

   A.     Summary of the ALJ's Findings

The ALJ evaluated plaintiff's entitlement to DIB and SSI pursuant to the Commissioner's standard five-step analytical framework.[3] As an initial matter, the ALJ found

---

[3] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program. 42 U.S.C. §§ 401 et seq. Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. §§ 1382 et seq. Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A parallel five-step sequential evaluation governs eligibility for benefits under both programs. See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-42, 107 S. Ct. 2287 (1987). The following summarizes the sequential evaluation:

> Step one:  Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.
> Step two:  Does the claimant have a "severe" impairment? If so, proceed to step three.  If not, then a finding of not disabled is appropriate.

3

that plaintiff remained insured for purposes of DIB through December 31, 2009.  (AT 13.)  At the first step, the ALJ concluded that plaintiff had not engaged in substantial gainful activity since August 27, 2008, plaintiff's alleged disability onset date.  (Id.)  At step two, the ALJ determined that plaintiff had the following severe impairments: COPD, chronic low back pain, bipolar disorder, and possibly substance addition disorder.  (Id.)  However, at step three, the ALJ determined that plaintiff did not have an impairment or combination of impairments that meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (AT 14.)

Before proceeding to step four, the ALJ assessed plaintiff's residual functional capacity ("RFC") as follows:

> [T]he undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b).  Light work requires lifting or carrying up to twenty pounds on an occasional basis, lifting or carrying up to ten pounds on a frequent basis, and standing or walking up to six hours (with normal breaks) in an eight-hour workday.  The claimant has additional limitations enumerated as follows: no climbing of ladders, ropes, or scaffolds; climbing of ramps or stairs on no more than an occasional basis; balancing, stooping, kneeling, crouching, or crawling on no more than an occasional basis; and moderate limitations in the ability to withstand stress and pressures of day-to-day work activity.  The claimant does retain the ability to relate and interact with coworkers or supervisors; to understand and remember technical or complex job instructions; to understand and remember detailed but

---

Step three:  Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.
Step four:  Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.
Step five:  Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process.  Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5.  The Commissioner bears the burden if the sequential evaluation process proceeds to step five.  Id.

4

>uncomplicated job instructions; to understand and remember simple one or two-step job instructions; to deal with the public; and to maintain concentration, persistence, and pace.

(AT 15.)

At step four, based on vocational expert testimony, the ALJ found that plaintiff was capable of performing past relevant work as a fast food worker (which is unskilled light work); cake decorator (which is semiskilled light work); census taker (which is unskilled light work); mail handler (which is semiskilled light work); and agricultural sorter (which is unskilled light work). (AT 19.)[4]

Accordingly, the ALJ concluded that plaintiff had not been under a disability, as defined in the Act, from August 27, 2008, through the date of the ALJ's decision. (AT 21.)

### B. Plaintiff's Substantive Challenges to the Commissioner's Determinations

#### 1. Whether the ALJ improperly rejected the opinion of plaintiff's treating physician

Plaintiff contends that the ALJ improperly rejected the opinion of plaintiff's treating physician and primary health care provider, Dr. Dwayne Vandeberg, regarding plaintiff's mental and physical impairments.

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals. Holohan v. Massanari, 246 F.3d 1195, 1201-02 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995). Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual. Id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).

////

---

[4] In the alternative, the ALJ proceeded to step five and found, based on vocational expert testimony, that plaintiff was capable of performing other work that existed in significant numbers in the national economy. (AT 19-20.)

To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions. An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons. Lester, 81 F.3d at 830-31. In contrast, a contradicted opinion of a treating or examining professional may be rejected for "specific and legitimate" reasons. Lester, 81 F.3d at 830. While a treating professional's opinion generally is accorded superior weight, if it is contradicted by a supported examining professional's opinion (supported by different independent clinical findings), the ALJ may resolve the conflict. Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)). The regulations require the ALJ to weigh the contradicted treating physician opinion, Edlund, 253 F.3d at 1157,[5] except that the ALJ in any event need not give it any weight if it is conclusory and supported by minimal clinical findings. Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999) (treating physician's conclusory, minimally supported opinion rejected); see also Magallanes, 881 F.2d at 751. The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional. Lester, 81 F.3d at 831.[6]

In this case, plaintiff received treatment primarily from Dr. Vandeberg, her primary health care provider, prior to and as of the alleged disability onset date of August 27,

---

[5] The factors include: (1) length of the treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis; (5) consistency; (6) specialization. 20 C.F.R. § 404.1527.

[6] Plaintiff points to a statement by the vocational expert that he would "absolutely" look at the opinions of the treating doctor in determining plaintiff's vocational abilities. (AT 76.) However, while the Commissioner considers opinions from medical sources regarding a claimant's RFC, the ALJ has the final responsibility for determining the claimant's RFC (which is then used by the vocational expert for giving vocational testimony). 20 C.F.R. § 404.1527(d)(2). Therefore, assuming that the medical evidence and opinions were properly considered by the ALJ within the framework outlined above, the ALJ's RFC assessment would be supported by substantial evidence, and the vocational expert's opinion as to what medical evidence should have been credited or given controlling weight is irrelevant.

2008. (AT 319-83, 408-32, 448-79.) On December 5, 2010, Dr. Vandeberg completed a "Lumbar Residual Functional Capacity Questionnaire." (AT 481-85.)[7] Dr. Vandeberg indicated that he generally saw plaintiff on a monthly basis, and diagnosed her with multi-level bulging disks with nerve impingement, causing chronic low back pain that fluctuates throughout the day and occasional paresthesia in the legs. (AT 481.) He noted that plaintiff also reported muscle weakness, chronic fatigue, sensory changes, impaired sleep, weight change, impaired appetite, and abnormal posture. (Id.) Dr. Vandeberg suggested that plaintiff's medication could cause mild sedation and have a mild effect on her coordination. (AT 482.)

Dr. Vandeberg stated that plaintiff's lumbar range of motion was 100% for extension and 75% for flexion, left/right rotation, and left/right lateral bending. (AT 481.) He opined that plaintiff could walk 1 block without rest or severe pain "per patient"; sit for 2 hours at one time; stand for 45 minutes at one time; sit at least 6 hours in an 8-hour working day; stand/walk about 2 hours total in an 8-hour working day; and sit/stand/walk at least 6 hours in an 8-hour working day. (AT 483.) Dr. Vandeberg further stated that plaintiff needed to walk every 90 minutes for about 15 minutes; required a sit/stand option; and needed to take an unscheduled break up to every 3 hours for 15 minutes. (Id.) According to Dr. Vandeberg, plaintiff could never lift 20 pounds, occasionally lift 10 pounds, and frequently lift less than 10 pounds; could occasionally look down, turn her head right or left, look up, or hold her head in a static position; could rarely twist, stoop/bend, crouch/squat, and climb ladders or stairs; could use her fingers for fine manipulation for 75 % of the workday; could use her hands to grasp, turn, or twist objects for 60% of the workday; and could use her arms for reaching for 50% of the workday. (AT 484.)

---

[7] Plaintiff notes that, in addition to this questionnaire, Dr. Vandeberg also verified for the food stamp program and plaintiff's community college that plaintiff was disabled due to mental and physical impairments. (AT 234, 235.) Plaintiff contends that the ALJ erred by failing to discuss those forms. As an initial matter, the ALJ did reference Dr. Vandeberg's preparation of paperwork for food stamps. (AT 16.) In any event, findings of disability for purposes of other programs or agencies are not binding in social security cases, because such programs may have rules that differ from social security law. See 20 C.F.R. § 404.1504. While the court considers these documents as part of the entire record, they are not dispositive.

Dr. Vandenberg also opined that plaintiff would be absent from work about 3 days per month due to her impairments or treatment. (Id.)

Dr. Vandenberg further noted that plaintiff suffered from depression, anxiety, and other psychological factors that affected her physical condition, and that her symptoms were frequently severe enough to interfere with the attention and concentration needed to perform even simple work tasks. (AT 482.) He opined that plaintiff was incapable of even low stress jobs "as per patient." (Id.) Dr. Vandeberg observed that plaintiff was not a malingerer and that her impairments could be expected to last at least twelve months. (Id.)

After considering the record as a whole, the court finds that substantial evidence supports the ALJ's analysis with respect to plaintiff's mental impairments. In discounting Dr. Vandeberg's opinion concerning plaintiff's mental impairments, the ALJ relied primarily on the opinion of consultative examining psychologist Dr. John Foster, who evaluated plaintiff on July 28, 2009. (AT 311-18.) Plaintiff told Dr. Foster that she had been diagnosed with bipolar disorder and post traumatic stress disorder ("PTSD"), felt depressed 95% of the time, was unable to sleep, cried often, was anxious, experienced memory problems, and had anorexia.[8] (AT 312.) She admitted use of recreational drugs and heavy drinking in the past, stating that she continued to drink alcohol occasionally, even though she probably should not drink at all. (Id.) Dr. Foster observed that plaintiff was well groomed, oriented, and maintained good eye contact, but appeared depressed with mildly delayed psychomotor activity. (AT 313.) After performing a mental status examination and a battery of psychological tests, Dr. Foster found at most mild to moderate limitations with respect to some components of the testing, and he assessed plaintiff's

---

[8] In particular, plaintiff informed Dr. Foster that, although her weight at the time of the consultative examination was the highest it had been in the last two years, it had previously been down to 96 pounds. (AT 312.) However, the ALJ noted that plaintiff's treatment records from May 2007 to October 2010 showed a low weight of 119.5 pounds on May 12, 2009, and a high weight of 146.0 pounds on April 5, 2010, which put her Body Mass Index ("BMI") between 20.5 and 25.1. (AT 13-14.) Although plaintiff had asked for dietary advice, she never entered any in-patient treatment program. (Id.) Accordingly, the ALJ found plaintiff's anorexia to be non-severe, and plaintiff does not challenge that finding on appeal. (AT 13.)

overall intellectual ability and working memory to be in the average range, with attention, concentration, and pace also within normal limits. (AT 314.)

Dr. Foster diagnosed plaintiff with bipolar disorder and PTSD (per plaintiff's report), alcohol abuse, and suggested ruling out a panic disorder. (AT 314.) He opined that plaintiff was not limited in her ability to relate and interact with supervisors and co-workers, understand and remember simple one or two-step job instructions, and maintain concentration, persistence, and attention; was minimally limited in her ability to understand and remember an extensive variety of technical and/or complex job instructions, understand and remember detailed but uncomplicated job instructions, and deal with the public; mildly to moderately limited in her ability to withstand stress and pressures associated with day-to-day work activity due to her medical concerns, physical discomfort, feelings of depression, and emotional distress; and had no significant cognitive or memory limitations. (AT 315.)

Dr. Foster's opinion was based on his examination and independent clinical findings, and therefore constitutes substantial evidence. See Andrews, 53 F.3d at 1041. In giving the greatest weight to Dr. Foster's opinion, the ALJ reasoned that Dr. Foster's opinions are "better supported than those of Dr. Vandeberg, both by virtue of areas of expertise, and the sophisticated test instruments used by Dr. Foster. Dr. Foster does recognize some limitations, especially regarding workplace stresses or pressures, which have been incorporated into the residual functional capacity finding." (AT 18.) While a primary care physician is qualified to give an opinion as to a claimant's mental impairments, see Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987), and the ALJ could not reject Dr. Vandeberg's opinion solely because he is not a psychologist or psychiatrist, the regulations also permit an ALJ to give more weight to the opinion of a specialist in the relevant area. See 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist"); Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (explaining that an opinion concerning mental impairments by a

specialist in the relevant field of psychiatry was entitled to greater weight).

Although plaintiff argues that Dr. Vandeberg in the course of his long-time treatment relationship with plaintiff had a greater opportunity to assess plaintiff's mental health,[9] Dr. Vandeberg did not conduct any comprehensive mental status evaluation or testing. Instead, Dr. Vandeberg mostly prescribed medication and his notes on several occasions indicate that plaintiff's mental impairments were stable and well-controlled on medication. (See, e.g. AT 468 [December 18, 2009 note indicating that plaintiff's "mood disorder" was well controlled on Lexapro and Zyprexa]; AT 459 [May 26, 2010 note indicating that plaintiff's bipolar disorder and depression were stable on Lexapro and Zyprexa].) Additionally, plaintiff's argument that Dr. Foster's testing only focused on her cognitive or intellectual functioning is devoid of merit. To the contrary, Dr. Foster specifically noted plaintiff's reported diagnoses of bipolar disorder and PTSD, noted her complaints of depression and anxiety, performed a comprehensive mental status examination, and ultimately found mild to moderate limitation in plaintiff's ability to withstand stress and pressure in part based on her depression and emotional distress. (AT 312-15.)

Furthermore, Dr. Foster's opinion is generally consistent with the assessments of mental health providers at Sutter-Yuba Mental Health Services ("SYMHS") from whom plaintiff received some limited treatment. On August 11, 2008, Dr. Oscar Jaurigue noted that plaintiff was agreeable, fairly calm, in a fairly good mood, well oriented, and had a fairly intact memory, adequate fund of general knowledge, some insight, and largely unimpaired judgment. (AT 254.) Plaintiff reported no medication side effects. (Id.) Dr. Jaurigue diagnosed plaintiff with bipolar disorder, PTSD, and polysubstance dependence, and prescribed medication and group therapy. (Id.) Thereafter, plaintiff failed to appear for her September 10, 2008 appointment, and on October 21, 2008, plaintiff requested a different psychiatrist, stating that she did not agree with

---

[9] While the extent of the treatment relationship is one factor for the ALJ to consider, it is not controlling, because in virtually every case the treating physician would have a more extensive relationship with the claimant than a consultative specialist.

Dr. Jaurigue's diagnosis and did not believe that medication was necessary for her problem. (AT 252-53.) Subsequently, on June 21, 2009, plaintiff was again seen at SYMHS after her sister reported that plaintiff needed help dealing with her mother's death. (AT 304.) At that time, plaintiff expressed a desire to "leave and travel when she gets her disability check." (AT 305.)

Even though plaintiff makes much of the fact that Dr. Jaurigue at the August 11, 2008 appointment assessed a GAF score of 49, suggestive of serious symptoms or impairment,[10] GAF scores are not dispositive in social security cases. Trinchere v. Astrue, 2008 WL 4395283, at *6 (C.D. Cal. Sept. 3, 2008). A low GAF score does not alone determine disability, but is a piece of evidence to be considered with the rest of the record. Olds v. Astrue, 2008 WL 339757, at *4 (D. Kan. Feb. 5, 2008) (citation omitted). An ALJ is permitted to discredit a GAF score where it is unsupported by objective evidence. Clark v. Astrue, 2009 WL 542166, at *6 (C.D. Cal. Mar. 4, 2009). In this case, given Dr. Jaurigue's benign clinical findings, the low GAF score was more likely attributable to plaintiff's family circumstances at the time, including plaintiff's difficulties in caring for her ill mother and dealing with her daughter and granddaughter's molestation. (AT 254.)

Finally, plaintiff argues that Dr. Foster's opinion is not reliable, because he did not have access to plaintiff's prior treatment records. To be sure, the regulations require that a consultative examiner be given any necessary background information about the plaintiff's condition. 20 C.F.R. § 404.1517. Background information is essential because consultative exams are often utilized "to try to resolve an inconsistency in the evidence." 20 C.F.R. § 404.1519a(b). However, in this case, any failure to provide plaintiff's prior treatment records to Dr. Foster was harmless error, because Dr. Vandeberg's treatment records contain minimal

---

[10] GAF is a scale reflecting "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM IV"). According to the DSM IV, a GAF of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Id.

clinical findings concerning plaintiff's mental impairments, and, as discussed above, the SYMHS records document findings that are generally consistent with those of Dr. Foster. As such, these records could not reasonably have caused Dr. Foster to alter his assessment. See Curry v. Sullivan, 925 F.2d 1127, 1129 (9th Cir.1990) (harmless error analysis applicable in judicial review of social security cases). In any event, state agency psychiatrist Dr. Haroun and state agency psychologist Dr. Stern, who did review plaintiff's prior records on August 26, 2009, and March 1, 2010, respectively, both concluded that plaintiff's mental impairments were not severe. (AT 384-97, 439-40.)

For these reasons, the court concludes that the ALJ provided specific and legitimate reasons for rejecting Dr. Vandeberg's opinion as to plaintiff's mental impairments, and that substantial evidence in the record as a whole supports the ALJ's findings.

In regard to plaintiff's physical impairments, the ALJ reasoned as follows:

> As for the opinion evidence regarding physical function, the undersigned gives greatest weight to the State agency physician, J. Becker, M.D. The claimant's treatments for low back pain and breathing difficulties have taken place entirely through her primary care physician, and no pulmonary specialist or orthopedic specialist has engaged in more detailed or invasive treatments. Dr. Vandeberg appears to manage the claimant's conditions with medications. Considering the entirety of the record, Dr. Becker's opinions recognize the existence of severe impairments, but he has given a reasonable set of restrictions. Indeed, in limited respects, treating physician Dr. Vandeberg is consistent with Dr. Becker, such as finding overall good range of motion, and good manipulative function in her upper extremities.

(AT 18.)

The court agrees that Dr. Vandeberg's relatively severe assessment appears somewhat at odds with his more benign clinical findings. For example, on October 30, 2008, Dr. Vandeberg noted that plaintiff flexed her lumbosacral spine to 90 degrees without difficulty, neurovascular function of both lower extremities was grossly intact, and a straight leg test was negative bilaterally. (AT 337.) On February 4, 2009, despite plaintiff's complaints of severe low back pain, Dr. Vandeberg stated that inspection of her lumbosacral spine was unremarkable with

neurovascular function in both lower extremities grossly intact.  (AT 331.)  Subsequently, on October 16, 2009 and July 9, 2010, Dr. Vandeberg observed that plaintiff was "without any acute complaints."  (AT 413, 457.)  Thereafter, on October 1, 2010, he noted that although plaintiff's lumbosacral spine was tender, she was able to flex it to 90 degrees, and neurovascular function of both her lower extremities was grossly intact.  (AT 452.)  Furthermore, it appears that several of the limitations assessed by Dr. Vandeberg are based largely on plaintiff's subjective complaints; for example, the "incapable of even low stress jobs" limitation that was designated by Dr. Vandeberg as "as per patient."  (AT 482.)

Additionally, as the ALJ observed, Dr. Vandeberg primarily managed plaintiff's back impairment[11] with medication, and did not refer plaintiff for further evaluation by an orthopedic specialist, surgery, injections, or physical therapy.  Conservative treatment can plausibly suggest "a lower level of both pain and functional limitation."  Johnson v. Shalala, 60 F.3d 1428, 1434 (9th Cir. 1995); Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001) (explaining that treatment notes reflecting that the claimant was "in no acute distress" and prescription of a conservative course of treatment are "not the sort of description and recommendations one would expect" to accompany a finding of total disability).

Nevertheless, after a review of the entire record, the court cannot find that substantial evidence supports the ALJ's findings with respect to plaintiff's physical impairments, and in particular her back impairment.  Although there are some serious questions as to Dr. Vandeberg's opinion, he had been treating plaintiff regularly and extensively for several years.  Moreover, there is at least some objective evidence that supports his findings, such as the March 4, 2009 MRI of plaintiff's lumbar spine, which showed several disc bulges, one of which was

---

[11] As noted above, plaintiff's other severe physical impairment is COPD.  However, Dr. Vandeberg's treatment notes mostly reflect that plaintiff's lungs were clear and that her COPD was managed well with medication and inhalers.  (AT 319-83, 408-32, 448-79.)  Although Dr. Vandeberg's functional capacity questionnaire indicated that plaintiff's COPD might cause her to experience shortness of breath and easy fatigability with "intense exertion," this limitation does not appear to conflict with the ALJ's assessment for light work.  (AT 485.)

noted to contact the S1 nerve root. (AT 270.)

Moreover, although the ALJ found that plaintiff's conditions were managed with medications, the record shows that plaintiff is being treated with large doses of strong narcotic medication for her back impairment. For example, as of November 8, 2010, plaintiff was taking 1-2 tablets of higher strength Norco (10/325 mg) four times a day, in addition to a number of other medications. (AT 451.)[12] This medication could suggest that the pain and functional limitations attributable to plaintiff's back impairment are more severe than the ALJ found. On the other hand, it is also possible that plaintiff is overmedicating and not receiving appropriate non-medicinal treatment for her back condition. Indeed, it seems strange that plaintiff was prescribed large doses of strong narcotic medication, while at the same time the record does not document referral for further evaluation by an orthopaedic specialist or prescription of additional treatment such as injections, physical therapy, or potentially surgery. Additionally, Dr. Vandeberg himself at times expressed concern that plaintiff had developed a tolerance to Vicodin and other medications, as well as increased sensitivity to pain from chronic analgesic use. (AT 331, 334.) Plaintiff once reported to another doctor at Dr. Vandeberg's clinic that she was using up to 11-12 Vicodin tablets a day, and that doctor informed her that the limit was 8 tablets per day. (AT 354.) Furthermore, the record contains several references to plaintiff running out of her medications and reporting that her medications were lost or stolen. (See e.g. AT 329, 347, 416, 454, 457.) The court cannot independently make determinations regarding these medical ambiguities and inconsistencies, which are best resolved by the ALJ after obtaining a thorough consultative examination and evaluation of plaintiff's back impairment. For a reason not set forth in the record, the Commissioner elected not to obtain such a consultative evaluation.

////

---

[12] Norco consists of a combination of hydrocodone and acetaminophen used to relieve moderate to moderately severe pain. http://www.mayoclinic.com/health/drug-information/DR603225.

As noted above, the ALJ relied primarily on the opinion of non-examining state agency physician Dr. Becker in assessing the functional limitations attributable to plaintiff's physical impairments. The Commissioner correctly points out that the opinion of a non-examining physician may serve as substantial evidence when the opinion is consistent with independent clinical findings or other evidence in the record. Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002). However, while Dr. Becker's opinion is arguably consistent with some portions of the other record evidence, neither Dr. Becker's opinion, nor the ALJ's analysis, adequately addresses the above inconsistencies and ambiguities in the record evidence. Dr. Becker's opinion consists of little more than a check-the-box form without any medical reasoning. (AT 306-10.) Also troubling is the fact that Dr. Becker's consultant code indicates that he is an opthalmologist, with no apparent expertise in back impairments. (AT 310.) For these reasons, the court cannot conclude that the ALJ's findings with respect to plaintiff's back impairment are supported by substantial evidence in the record as a whole.

Accordingly, remand for a consultative evaluation by an orthopaedic specialist or other appropriate specialist(s) with full access to plaintiff's prior treatment records is necessary. Depending on the results of the consultative evaluation, the ALJ may also consider conducting a supplemental hearing with vocational expert testimony regarding any limitations found.

    2.    <u>Whether the ALJ improperly discounted the testimony of plaintiff and third parties as to the nature and extent of plaintiff's functional limitations</u>

Finally, in light of the court's conclusion that the case should be remanded for further development of the record, which may or may not impact the ALJ's credibility determinations, the court declines to address these issues at this juncture.[13]

---

[13] In its briefing before this court, the Commissioner points to several potential reasons for discounting plaintiff's credibility. For example, the Commissioner points to plaintiff's multiple reports of lost and/or stolen medication; purported inconsistencies between plaintiff's statements, testimony, and activities; and plaintiff's statement that she wanted to "leave and travel when she gets her disability check." (Dkt. No. 20 at 8 n.3, 23.) As the Commissioner is

15

V.   CONCLUSION

    For the foregoing reasons, IT IS HEREBY ORDERED that:

    1.   Plaintiff's motion for summary judgment (Dkt. No. 18) is GRANTED IN PART.

    2.   The Commissioner's cross-motion for summary judgment (Dkt. No. 20) is DENIED.

    3.   This matter is remanded for further proceedings consistent with this order pursuant to sentence four of 42 U.S.C. § 405(g).

    4.   Judgment is entered for plaintiff.

    5.   The Clerk of Court is directed to close this case.

    IT IS SO ORDERED.

DATED:   December 13, 2012

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

---

well aware, the court is required "to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ-not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking." Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1225 (9th Cir. 2009). The Commissioner's decision "must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." See Barbato v. Comm'r of Soc. Sec. Admin., 923 F. Supp. 1273, 1276 n.2 (C.D. Cal. 1996); see also Gonzalez v. Sullivan, 914 F.2d 1197, 1201 (9th Cir. 1990) ("[W]e are wary of speculating about the basis of the ALJ's conclusion...."). Thus, if the ALJ wishes to discount plaintiff's credibility (or the credibility of third party statements) on remand, the ALJ must outline specific, clear, and convincing reasons for doing so in the written decision. See Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009).